UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                              Case No. 17-cr-20465
     v.                       Hon. Denise Page Hood

SPILIOS PAPPAS,
JOSEPH BETRO,
TARIQ OMAR, and
MOHAMMED ZAHOOR,

     Defendants.
_____/

**ORDER DENYING MOTIONS FOR
NEW TRIAL [ECF Nos. 479, 480, 481]**

## I.    Introduction

On February 4, 2020, following a three-week trial, a jury returned a verdict of guilty on all counts, including: (1) on Count I, for conspiracy to commit health care and wire fraud (against all four Defendants, Spilios Pappas, Joseph Betro, Tariq Omar, and Mohammed Zahoor); (2) on Count II, for health care fraud (Pappas); (3) on Count III, for health care fraud (Betro); (4) on Count IV, for health care fraud (Omar); and (5) on Count V, for health care fraud (Zahoor). The jury deliberated for less than four hours.

1

Defendants Omar, Zahoor, and Pappas filed Motions for New Trial. ECF Nos. 479, 480, and 481, respectively.  Pappas filed a notice of joinder regarding the Motions for New Trial filed by Omar and Zahoor, ECF No. 482, and Betro filed a notice of joinder regarding all three Motions for New Trial, ECF No. 483.  After the Government filed a joint response to the three Motions for New Trial, ECF No. 486, each of Omar and Pappas filed a reply brief with respect to his Motion for New Trial. ECF Nos. 487, 488, respectively.  The Court previously issued a Notice of Determination that it would decide the Motions for New Trial on the briefs, without oral argument. ECF No. 484.  For the reasons set forth below, the Motions for New Trial are denied.

## II.    The Trial

The Government prosecuted this action under the theory that Defendants executed a "shots-for-pills" protocol at Tri-County Physician Group, P.C. and related entities (the "Tri-County network").  In essence, Defendants were alleged to have caused Medicare beneficiaries to receive medically unnecessary injections in the back, in exchange for which they would be able to obtain prescriptions for opioids.  Defendants then billed those injections to Medicare as "facet joint injections," even though only Marcaine (therapeutic) injections – not facet joint injections – were administered, because facet joint injections would be paid at a higher rate.  The Government also contended that Defendants ordered expensive

and medically unnecessary urine testing and other ancillary services.  Specifically, testing of 56 different drugs was ordered for every patient and every visit, even though Defendants did not consult patients about the results or change prescription patterns when results indicated possible drug abuse.

The Court finds that the Government introduced evidence sufficient from which a reasonable factfinder (jury) could find each of Defendants guilty beyond a reasonable doubt of conspiracy to commit health care fraud and wire fraud, as well as health care fraud.  The first witness, Stephen Quindoza, who has worked on behalf of Medicare since 1997, set the tone for the trial.  He testified about the rules and regulations that govern facet joint injections, drug testing, and other ancillary services.  He testified, without opposition that, until late 2015, Medicare would reimburse a provider for only four facet joint injection sessions per patient a year (increased to five sessions per year in 2016).  That testimony was critical to establishing the Government's case and damaging to Defendants' chances for acquittal because Defendants prescribed far more than 4 or 5 facet joint injections per year.  Often the injections were prescribed on a monthly basis, rendering many such injections illegal as medically unnecessary. Quindoza's testimony that a standing order to quantitatively test for 56 drugs – as many witnesses testified and exhibits showed was the protocol for Tri-County network physicians – did not satisfy Medicare's medical necessity requirements was significant because

Medicare requires that providers treat each patient individually when determining whether what drug testing is necessary.

The testimony of several doctors who worked for Tri-County network afforded the jury first-hand observations and experiences about how Tri-County network protocols did not conform to Medicare regulations. Dr. Ali Taqi and Dr. Anand Thakur testified that they quit working for Tri-County network after three shifts or less because of the established manner of prescribing narcotics to patients. Dr. Manish Bolina and Dr. Abdul Haq both worked for Tri-County network for a period of time, during which they performed the same protocols as Defendants, namely, requiring patients to receive Marcaine injections (which they testified were painful and billed as facet joint injections) in order to be prescribed opioids (often in amounts that exceeded CDC recommendations).

The Government also called Tri-County network's owner (Mashiyat Rashid) and office manager (Yasser "Eddie" Mozeb), each of whom testified extensively about the manner and purpose of the Tri-County network, including the model of requiring patients to get injections in exchange for opioid prescriptions. As the Government argues, Rashid testified that he explained to the doctors (including Defendants) that their financial return depended on the number of injections that they billed and the focus of their conversations was money, not patient care.

Rashid, through his biller, instructed Defendants to rotate the location of the injections based on how much Medicare paid, not on what services Defendants actually provided.  Rashid also advised the physicians he employed to use certain diagnosis codes to guarantee payment, regardless of what conditions, if any, the patients presented.  Mozeb echoed that procedure when he testified that the physicians chose billing codes and diagnosis codes based on reimbursement. Rashid and Mozeb both testified that Rashid discussed how to "stay under the radar" with Pappas, Zahoor, and Betro, including limiting the number of shifts worked so that excessive amounts of opioids were not prescribed.  Rashid, with Pappas's agreement to fraudulently sign as owner of the clinic, changed the name of the clinic to Tri-State after Medicare rejected 100% of the facet joint injection claims in 2016.  Rashid and Mozeb both testified that Pappas, Betro, and Zahoor were paid kickbacks for referring patients for home health care and other ancillary services, including hiding Rashid's ownership of National Laboratories, Inc. on a Medicare audit questionnaire.

Although the Government called only three Medicare beneficiaries, they testified consistently about their experiences at the Tri-County network, including having to receive painful injections that were not helpful as a condition of getting an opioid prescription.  A former employee, Jarvis Mitchell, testified that Pappas, Omar, and Zahoor did not discuss MRIs, a diagnosis, or a plan of care with

patients.  Evidence also was admitted that the State of Michigan had suspended Omar's license to prescribe opioids after Omar entered into a February 7, 2017 consent order with the State of Michigan Department of Licensing and Regulatory Affairs in which Omar acknowledged that he previously had prescribed opioids for improper purposes.

Zahoor called two beneficiary witnesses, Elester Jones and Everett Downing, who confirmed that Zahoor prescribed them controlled substances after they unexpectedly tested positive for controlled substances. Jones testified that she never received a back injection before she saw Zahoor, but Zahoor gave her an injection at every visit, including her first visit with Zahoor. Downing testified that she never received a back injection after he stopped seeing Zahoor. Pappas called a beneficiary witness, Shirley Norris, who testified that she never received a back injection before or after seeing Pappas.  Norris also testified that she repeatedly received prescriptions from Pappas after her drug screens showed that she had not taken her pills.

All four defendants testified, and some of their testimony was inculpatory. Pappas knew he could be criminally prosecuted for health care fraud, but he chose not to adhere to Medicare's frequency limitation on facet joint injections and instead caused the submission of claims that were fraudulent. ECF No. 444 (Testimony of Pappas), PageID 5735-36 ("Q. And then you subsequently

performed these procedures and caused the submission of these claims that were fraudulent, correct, they violated Medicare's rules and regulations? A. Yes."). He also stated that the number of urine of drug tests he ordered at Tri-County was "nuts." ECF No. 444, PageID 5680 ("Q. Defendant Pappas, isn't it true that you told the FBI on November 3rd, 2017 that the quantitative testing of urine for 56 drugs is quote, unquote nuts? A. For 56 drugs, yes.").

Betro and Zahoor admitted to administering facet joint injections in amounts that were greater than permitted by Medicare's frequency limitations, and their orders concerning urine drug testing did not comport with Medicare rules and regulations. ECF 445 (Testimony of Betro), PageID 5934 ("Q. And so you violated Medicare's rules and regulations by causing the submission of claims, ordering testing for routine screening for all of your patients, whether or not there was a positive or negative inconsistent finding in the test in the office, correct? A. If you take this paragraph in that context, yes."), PageID 5967-68 ("Q. And although it says, "Medicare does not expect patients to routinely undergo repeat treatments at the same region at less than 90-day intervals," you in fact performed and caused the billing for repeat treatments routinely at the same region on a monthly basis, isn't that correct? A. Different levels in the regions on a monthly basis, yes. Q. And you did that in the same region at less than 90-day intervals, correct? A. Yes. Q. And as we saw, you also billed more than five times a year per region in violation

of Medicare's guidelines, correct? A. Yes."); ECF No. 446 (Testimony of Zahoor), PageID 6099 ("Q. My question was: Each and every time you billed for more than five facet joint injections, you violated Medicare's rules, correct? A. Correct.").

Omar testified that, when he shadowed Pappas and Zahoor, those Defendants gave facet injections and opioids to every patient. ECF No. 448 (Testimony of Omar), PageID 6328 ("Q. Okay. And when you shadowed Defendant Pappas, was he giving facet joint injections to every patient? A. What I saw in those three days, yes. Q. And when you shadowed Defendant Pappas, was he giving bilateral facet joint injections to every patient? A. Yes. Q. And when you shadowed Defendant Pappas, was he writing prescriptions for Oxycodone? A. Yes. Q. And when you shadowed Defendant Zahoor, was he giving facet joint injections to every patient? A. For the time I shadowed, yes. Q. And when you shadowed Defendant Zahoor, was he giving bilateral facet joint injections to every patient? A. Yes. Q. And when you shadowed Defendant Zahoor, was he giving every patient Oxycodone 30-milligrams? A. Yes."). Omar also testified that the facet joint injections and urine drug tests that Tri-County billed to Medicare were medically unnecessary. ECF NO. 446, PageID 6329-30 ("Q. Now, on Government's Exhibit 3 there's money billed by the Tri-County clinics, correct? A. Yes. Q. And that's the claims for facet injections and office visits and things like that? A. Yes. Q. Correct? A. Yes. Q. And you'd agree those claims were medically unnecessary,

sitting here today, correct? A. Yes.  Q. And the Tri-County Laboratories, you'd agree that that urine drug testing for 56 drugs, that was medically unnecessary, correct? A. Yes.").

As the Government describes in its response brief, *see* ECF No. 486, PageID 6970, there were also hundreds of exhibits that corroborated the Government's witnesses and contradicted Defendants' positions.  There were bank records that showed how Defendants profited from the fraud (Government Exhibit ("GX") 1001-1279); Medicare enrollment applications, which established that Defendants' knowledge of their obligations and certifications to Medicare (GX 101-149); incriminatory emails and text messages discussing the intricacies of the fraud (GX 702-705, 802-872); search warrant documents, which included letters of warning that drug dealers visited the clinics and billing "cheat sheets" (GX 501-531); and summary exhibits, which depicted Tri-County as one of the most fraudulent facet joint practices in the country (GX 1-85).  Dozens of patient files were admitted. They contained what were described as: cloned visit notes, progress notes falsified to pass Medicare audits, and informed consent forms that explained that Marcaine is intended for diagnostic injections only. GX 601-622.

## III.   Applicable Legal Standards

### A.   Rule 33

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "A motion for a new trial can be premised on the argument that the verdict was against the manifest weight of the evidence," or on a "substantial legal error." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).

**B.     Manifest Weight of the Evidence**

Where the jury's verdict contradicts the manifest weight of the evidence, Rule 33 allows district courts to grant a new trial to the defendant. *See, e.g., United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). "When considering a motion for a new trial [based on the weight of the evidence], the district court may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Lewis*, 521 F. App'x 530, 532 (6th Cir. 2013).  The Supreme Court has explained, "The 'weight of the evidence' refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." *Tibbs v. Fla.*, 457 U.S. 31, 37-38 (1982). In other words, the court need

not find that there was insufficient evidence to support the jury's verdict, just that the weight of the evidence did not support the verdict – a much lower standard. *Id.*

When determining whether to a grant a new trial, "[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Tibbs*, 457 U.S. at 38, n.11. This Court is entitled to "credit [a defendant's] innocent explanations for [his] actions over the sinister interpretation posited by the government." *United States v. Souder*, 436 F. App'x 280, 292 (4th Cir. 2011). In fact, "it is precisely this kind of credibility determination that is the trial court's call to make on a motion for a new trial." *Id.*

### C.    Legal Error

"Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *Munoz*, 605 F.3d at 373. When evaluating whether legal errors warrant a new trial, a district court should "weigh the errors against the record as a whole to determine whether those errors in the conduct of the trial justify a new trial." *United States v. Rapanos*, 115 F.3d 367, 372 (6th Cir. 1997).

### D.    Prosecutorial Misconduct

The government "may prosecute with earnestness and vigor. . . . But while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*

*v. United States*, 295 U.S. 78, 88 (1935). "The Sixth Circuit has adopted a two-step approach for determining when prosecutorial misconduct warrants a new trial." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).

> Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper. If the remarks were improper, the court must then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal. These four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id*. (internal citations omitted).  If the remarks were not flagrant, a defendant will be entitled to a new trial only if: (1) proof of his guilt was not overwhelming; (2) he objected to the improper remarks; and (3) the court failed to cure the error with an admonishment to the jury. *United States v. Carroll*, 26 F.3d 1380, 1385-87, 1390 (6th Cir. 1994).

The Sixth Circuit has provided guidance as to what constitutes improper conduct or remarks on the part of the prosecution. "A prosecutor's remark is improper if it refers to facts not in evidence or the prosecutor's personal opinion," *United States v. Uwazurike*, 580 F. App'x 440, 449 (6th Cir. 2014), or "states his personal opinion concerning . . . the guilt of a defendant." *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir. 1986) (quoting *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976)); *see also United States v. Bess*, 593 F.2d 749, 755 (6th

Cir. 1979) ("Implicit in an assertion of personal belief that a defendant is guilty, is an implied statement that the prosecutor, by virtue of his experience, knowledge and intellect, has concluded that the jury must convict. The devastating impact of such 'testimony' should be apparent.").

The Sixth Circuit "has recognized that it is improper for attorneys, especially prosecutors who generally have the confidence of juries, to misstate evidence." *Carter*, 236 F.3d at 785. Similarly, it is improper for a prosecutor to bolster or vouch for testimony. *United States v. Bailey*, 547 F. App'x 756, 761 (6th Cir. 2013). "[P]rosecutorial appeals to wealth and class biases can create prejudicial error, violating a defendant's right to due process of law." *United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) (citing *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990)). "Encouraging the jury to disregard the law and minimizing the prosecutor's duty to prove all of the elements of the crime beyond a reasonable doubt falls below acceptable prosecutorial advocacy and makes a mockery of the principles underlying our system of justice." *Hamilton v. Jackson*, 416 F. App'x 501, 504 (E.D. Mich. 2009).

## IV.    Omar's Motion for New Trial

### A.    Weight of the Evidence

Omar contends that the Government failed to show his intent to enter into a conspiracy or to commit healthcare fraud. Citing *United States v. Stacks*, 821 F.3d

1038, 1045-46 (8th Cir. 2016) (a new trial was warranted because defense evidence "negated any inference of intent to defraud"); *United States v. Shankman*, 13 F. Supp.2d 1358, 1366 (S.D. Ga. 1998) (granting a new trial because the "instances of wrongdoing do not evidence any specific intent to defraud but, instead, appear to be innocent mistakes"); *United States v. Morrison*, 220 F. App'x 389 (6th Cir. 2007).

The Court cannot agree.  Omar has offered certain evidence to support his claim, ECF No. 479, PageID 6890-91 (generally, that he had good faith intentions, the reason he following the protocol was that he was taught by the other doctors, and he did what he was told, including relying on what Rashid told him was protocol for experienced pain doctors).  Based on the evidence introduced by the Government, however, a reasonable jury could find beyond a reasonable doubt that Omar committed health care fraud and conspired to commit health care and wire fraud.

Omar proposes that the Court must weigh his testimony equally with the testimony presented by the Government, but the Court does not find that proposal persuasive.  The Government only called one patient treated by Omar (Carla Watson).  The fact that Watson saw doctors from Tri-County for approximately four years does not establish that Omar did not commit the crimes with which he is charged.  Even if the testimony that she was told not to come back due to the

14

presence of multiple illicit medications in her urine tests was accurate (noting that 25% of Watson's drug screens showed use of other drugs including cocaine), that does not outweigh the facts supporting Omar's involvement in the conspiracy nor in health care fraud. Although Watson testified that she allowed her father and uncle to continue receiving treatment at Tri-County, she also testified that Dr. Omar gave her unwanted injections that did not help her and that she left the clinic because she did not agree with the treatment she received.

Omar's argument basically assumes, and he asks the Court to conclude, that his testimony was more credible than another witness's testimony, such that the Court should find the evidence insufficient to show that Omar's intent was to defraud. Omar also suggests that the Court should discard (and the jury should have discarded) all testimony by Rashid and Mozeb. He states that neither of these witnesses (or any other witnesses) provided testimony that could support a finding of intent to defraud or to enter into a conspiracy, and such a finding by the jury was therefore against the weight of the evidence presented.

The Court is not persuaded by Omar's suggestion that none of the witnesses provided testimony that could support a finding that he had an intent to defraud or enter into a conspiracy. Omar's argument that one patient's testimony that Omar gave her unwanted injections that did not help her, weighed against the testimony of Omar, is insufficient to show that Omar's intent was to defraud ignores the

evidence introduced. The Government may have produced only one patient of Omar, but it also offered the testimony of Rashid and others, as well as data and documentation that constituted evidence of fraud.

First, Omar himself acknowledged that the facet joint injections and urine drug tests that Tri-County billed to Medicare were medically unnecessary.  Second, a former employee (Mitchell) testified that Omar did not discuss MRIs, a diagnosis, or a plan of care with patients.  Third, evidence was admitted that the State of Michigan had suspended Omar's license to prescribe opioids after he did so for improper purposes. Fourth, Special Agent Ward testified that, at the time of Omar's arrest, Omar admitted that his "patients would only receive prescriptions if they received injections." Fifth, Rashid and Mozeb testified regarding certain discussions and illegal billing practices in which Omar engaged.  For example, when Omar told Rashid that his patients did not need or want the injections, Rashid responded that Omar's financial return would suffer if Omar declined to give the injections, and Omar continued to give medically unnecessary injections. ECF No. 441 at 157 (Omar's claims for facet joint injections "remained the same"). Sixth, Bolina and Haq both testified that they took over some of Omar's patients and described what Omar's records for those patients showed.  The records showed numerous medically unnecessary injections and routine prescription of opioids; this constituted full participation in the protocol designed to defraud Medicare.

The Court similarly does not find Omar's claim that he signed office paperwork without reading it determinative of the absence of fraud, even if that testimony itself was uncontroverted.  Such testimony does not show ignorance of conspiracy or fraud, especially when, as discussed above, there was sufficient evidence of the same (*e.g.*, continuing to give injections even after telling Rashid that his patients did not need or want them).  Simply put, Omar's testimony was not so convincing as to preclude the jury from concluding beyond a reasonable doubt that he had the intent to defraud Medicare or participate in a conspiracy to do so.

### B.    Prosecutorial Misconduct

Omar argues that the Government engaged in improper conduct throughout the trial in three ways: (1) treating all four defendants as a single actor; (2) appealing to class prejudice; and (3) telling the jury in summation that the fastest way for them to go home was to look only at part of the evidence.

### 1.    Four Defendants

Omar contends that he was subjected to spillover prejudice in this case. Citing *United States v. Gallo*, 763 F.2d 1504, 1526 n.7 (6th Cir. 1985).  He argues that the Government introduced evidence as if the four defendants had the same intent, background, practices, and results, regularly referring to "these defendants," "these doctors," or "they," in the context of activity at Tri-County.  There is no

question that many witnesses, including co-defendants Rashid, Haq and Bolina, referred to "the(se) defendants," "the(se) doctors," and "they" (or "we") when testifying. *See* ECF No. 479, PageID 6897-99 (transcript references omitted).  On occasion, such testimony continued even after the Court sustained objections. Omar claims that such testimony was harmful to him because he was only at Tri-County from 2014 to 2016 and the conspiracy allegedly stretched from 2008 to 2018. *Id.* at 6899.

As Omar notes, however, the Court regularly sustained objections by defense counsel to the use of "we," "they," "the doctors," or "the defendants" by witnesses (especially Rashid) and the Government attorneys. And, when the Court sustained the objections, the Government posed new questions to witnesses that specified which Defendant(s) acted or failed to act with respect to the matter about which the applicable witness was testifying. Rashid, in particular, then spoke in detail about conversations and interactions with each Defendant, individually. *See generally* ECF Nos. 441, 442.

Omar contends that the Government doubled down on this "lumping together" tactic in its closing argument by repeatedly telling the jury what "these defendants" did. *See* ECF No. 479, PageID 6900-01 (citing ECF No. 448, at 138, 139, 140, 147, 153, 16).  Omar maintains that the Court's instruction was insufficient to mitigate the prejudice caused by the spillover effect of the testimony

against other defendants that would not have otherwise been admissible against Omar. Citing ECF No. 449, at 195 (instruction); *Gallo*, 763 F.2d at 1526 n.7 (noting that jury must be able to "give each defendant the separate and individual consideration of the evidence against him to which he [is] entitled"). He suggests that the jury heard weeks of evidence and was provided thousands of pages of exhibits, such that they could not be expected to separate out the evidence as to each defendant based on one jury instruction when the Government had made no efforts to segregate the evidence as it was presented. *Cf. United States v. Caldwell*, 560 F.3d 1202, 1213 (10th Cir. 2009) ("By grouping together the exhibits for each transaction and by organizing its questioning of each of its witnesses to address the transactions separately, the government assisted the jurors in keeping clear which transactions involved Mr. Caldwell and which did not.").

At trial, the Court overruled Omar's objection on this issue during the Government's rebuttal and instructed the jury that "[i]t is your duty to separately consider the evidence against each defendant on each charge and to return a separate verdict for each one of them. For each one, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge." The Court rejects Omar's contention that the Court's instruction to the jury did not sufficiently mitigate the prejudice to him, or that the jury could not be expected to separate out the evidence as to each

Defendant based on one jury instruction.  As set forth in the preceding section (Section IV.A.), there was sufficient evidence tied directly to Omar to convict him of the charges beyond reasonable doubt.

The Court also is not persuaded that the jury's limited period of deliberation demonstrates that the jury did not segregate the evidence against Omar from the evidence that was admitted only against the other three defendants. Citing *United States v. Jones*, 1990 U.S. App. LEXIS 6549, at *14 (6th Cir. 1990) (defendant prejudiced by "an inability of the jury to separate and to treat distinctively evidence that is relevant to each particular defendant on trial").  The Government introduced a significant amount of testimony and many exhibits that showed Omar (and the other Defendants on trial) billed for an excessive number of facet injections and required such injections as a condition to obtaining opioids.   Omar's acknowledgment that services were not medically necessary likely had a substantial impact on the jury's consideration of the charges against him.   The duration of the jury's deliberation does not establish that the jury did not consider the charges against Omar, individually.

2.   *Appeal to Class Prejudice*

Omar (and the other Defendants) asserts that the Government improperly appealed to class prejudice by encouraging the jury to view Dr. Omar as a greedy, rich doctor who set out to live a lavish lifestyle through fraud. He claims that such

"appeals to class prejudice are improper and cannot be condoned and trial courts should ever be alert to prevent them." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940); *see also United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) ("prosecutorial appeals to wealth and class biases can create prejudicial error, violating a defendant's right to due process of law.") (citation omitted).  Omar cites the testimony of Rashid regarding expensive tastes of Omar and evidence from Michael Petron that Omar made car payments for a Porsche and a Mercedes-Benz with money Petron said was "almost all" from Tri-County (based on Petron's methods of tracing money).

Omar argues now – as he did before the jury – that the Porsche was acquired in 2010 and the Mercedes in 2011. years prior to his employment at Tri-County, which shows no evidence of intent. He states that it is undisputed that he owned his own pulmonary practice during this time, had worked at various times over the same years in hospitals as an intensivist and consulting pulmonologist, and also worked for a time as a medical director for a psychiatric unit. For these reasons, he asserts that the Government simply was attempting to inflame the jury against a doctor who drove a Porsche and had a wife who drove a Mercedes Benz.  Omar also argues that nothing is wrong with withdrawing $250,000 in cash from his bank accounts over a period of time.  He claims that was not illegal, and the Government never introduced any testimony about the use of any of this cash yet

told the jury that these cash withdrawals were evidence of Omar's intent to commit fraud – because he "was a man of expensive taste."

Omar states that the treatment of all Defendants as a group enhanced the prejudice, as he was also linked to evidence of his co-defendants' expenditures on items like in-home basketball courts, gold bars, and vacation houses.  He believes that although the two cars, alone, might not have prejudiced the jury against Omar, the combination of the cars and the testimony about extravagant homes, rare and expensive jewelry, and stacks of gold owned by his co-defendants painted a picture for the jury of one in which Omar should be viewed with suspicion solely because of his financial status. Citing *Jackson-Randolph*, 282 F.3d at 377 (internal citation omitted); *see also Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990) (granting writ of habeas corpus based on prosecutor's repeated references to defendant's wealth, because "[s]uch appeals to class prejudice must not be tolerated in the courtroom").

Omar cites the Government's rebuttal summation to show its attempt to appeal to class prejudice to secure a conviction:

> You will also be instructed that no one can avoid responsibility for a crime by deliberately ignoring the obvious, and if there's no real dispute that the defendants were making $1,500 an hour, what were they intending when they left their mansions, when they left their indoor basketball courts, when they left their luxury pools, when they got into their porches [sic] and luxury vehicles, when they drove as far

away as Ohio, as in Defendant Pappas' case, all the way downtown to write opioids and administer injections in downtown Detroit?

. . . The judge will instruct you that you can consider circumstantial evidence, like [the] fact that this is just too much money for a part-time job and that it has the same weight as direct evidence in reaching your decision.

None of these doctors had any passion for pain management. So what were they really intending when they came to downtown Detroit and they got paid like brain surgeons to do nothing but write opioid prescriptions and perform work that Dr. Haq described as mechanical, an assembly line, not involving the use of any medical judgment, training or experience?

ECF NO. 449, Trial Tr. 157-58.

As the Court stated when allowing the Government to introduce evidence of compensation for services at Tri-County network and material goods and benefits enjoyed by Defendants, such evidence was permissible for purposes of showing motive and intent to defraud. The Court is not now persuaded that the Government's statements during closing arguments – arguments that the jury was advised on multiple occasions did not constitute evidence – were improper. And, even if any of the statements, individually or cumulatively, were improper, the Court concludes that such improper statements were not prejudicial in light of the evidence against Omar (and the other Defendants).

3.    *Request that Jury Disregard Evidence*

Omar contends that, in its rebuttal during closing arguments, the Government misled the jurors by telling them that they did not have to review all

of the evidence in the case. Omar claims the Government improperly encouraged the jury to ignore most of the evidence and focus only on the number of injections that were given, stating:

> And the fastest way for you to go home, ladies and gentlemen – and you will be instructed that when you go back to that jury room you are going to elect a foreperson and then you can start deliberating. We have been together a long time, and the fastest way for you to go home, the first question you could ask is when these defendants billed for more than five injections, when they did more than five injections and caused these claims to be submitted did they know they were doing something wrong?

ECF No. 448. at 153.  Omar argues that the jury's job is to consider all of the evidence to see if the charged crimes have been proven beyond a reasonable doubt, and the prosecutor's job is to use the evidence and inferences therefrom to make his case – to strike "hard blows," "not foul ones." *Berger*, 295 U.S. at 88; *see also State v. Bond*, 2006 Tenn.Crim. App. LEXIS 724, at *24-*25 (Tenn. Crim. App. Sept. 20, 2006) (improper for prosecutor to comment that it was defendant's fault the jurors were sequestered). Omar contends that, as it took the jury took only two and a half hours to deliberate and convict all four defendants of all of the charges against them, the Government's statement "in and of itself" violated Omar's right to a fair trial.

None of the Defendants objected to these comments at trial, which means that the Court must evaluate them under the plain error standard.  Defendants

cannot satisfy that standard. The prosecutor proposed a manner in which to commence deliberations. As the quoted language makes clear, he suggested that the jury ask themselves "did they [Defendants] know they were doing something wrong?" when Defendants administered more than five facet injections per year to a patient. The Court's instructions directed the jury on the elements that they would need to determine in order to decide each Defendant's innocence or guilt – and the Government's closing argument echoed the need to find guilt beyond a reasonable doubt with respect to each of the required elements. There is no reason to think that the jurors disregarded those instructions just because the Government suggested a place to start or a means by which they could get home quickest. There is no evidence or basis for finding that the jurors bypassed their responsibility to evaluate the evidence or make a determination of guilt based on evaluating the evidence in light of the elements of the crime, nor that the prosecutor's comments were of such a nature as to cause the jury to disregard their duty.

### 4.   Impropriety was Not Flagrant

Omar argues that, because the Government's comments were improper, a new trial should be granted based on the four *Carter* factors. *See supra* at Section III.D. (at pages 11-12). As set forth above, the Court is not persuaded that the

statements relied upon by Omar constituted improper statements or misconduct by the Government attorney's, so the *Carter* factors need not be applied in this case.

Even if the Court were to find that the Government's statements were improper, the Court is not persuaded that they were flagrant under the *Carter* factors, such that reversal is warranted.   The "improper" remarks of the prosecutor were isolated and did not mislead the jury.   Those remarks, together with the instructions of the Court and other statements of the prosecutor and defense counsel, caused little, if any, prejudice to Defendant. It is not possible for the Court to determine whether the remarks were deliberately or accidentally made, but the Court will assume they were deliberately made.   As discussed herein, the evidence against Omar (and the Defendants) was strong.   When weighing those factors, the Court concludes that the remarks were not flagrant.

The Court finds that Defendants have not established that proof of their guilt was not overwhelming, and they did not object to the improper remarks.   The Court instructed the jury that: (1) they had to consider the charges against each Defendant separately; (2) evidence regarding luxury items and high priced items was admissible only for the purpose of showing motive and the intent to defraud; and (3) they had to find that the Government satisfied each element of each charge against each Defendant beyond a reasonable doubt.   Accordingly, there would be

no basis for reversing the guilty verdicts because of non-flagrant improper statements. *Carroll*, 26 F.3d at 1385-87, 1390.

The Court also notes that both the Court and the Government's counsel made curative remarks that clarified that the government's statements were not evidence. For instance, in the second sentence of rebuttal, the government stated: "The judge will instruct you that what the lawyers say is not evidence. Evidence comes from the witness stand over there, and what came from the witness stand was clear." ECF NO. 449, Trial Tr. 146:16-19. Defendants seek a new trial because of comments to which they did not object. And, when the defendants did object to other comments not included in their Motions for New Trial, the Government agreed, stating, for example: (a) "And let's be clear. What I'm saying is not evidence. What these defense attorneys said is not evidence. The evidence is the evidence;" and (b) "And that's true, and what I say is not evidence. Your recollection, that's what's important."  The Court, of course, told the jury on numerous occasions, including during closing arguments, that what the attorneys say in argument is not evidence, including that "[y]our objection is preserved for the record, and the jury will rely on their independent memory of what the testimony was." and "I think it is closing argument, and the jury will recall the testimony for themselves."

There was no risk of jury confusion, and such comments are rarely enough, standing alone, to vacate the jury's verdict. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (stating that because "[t]he prosecutor began his closing argument by asking the jurors to 'bear in mind what I say is not evidence,' and was intended only 'to recreate . . . the scenario which I believe the evidence has indicated did, in fact, occur,'" and because the Court instructed the jury that the closing arguments were not evidence, the prosecutor's comments did not result in an unfair trial).

And, again, the evidence against Omar did not come down to the word of one patient.  For those reasons, the Court is not persuaded that the conduct of the prosecution warrants granting Omar a new trial.

### B.    Evidence of Spending Habits

Omar asserts that the Court erred when admitting Exhibits 72, 73, and 74, to which he raised pretrial objections, and when it allowed Petron's testimony regarding those exhibits, including his "tracing" of Omar's cash withdrawals and car payments to money received from Tri-County. The Government argued that this evidence was proper to show motive, but also states that such evidence could be admitted as "evidence of extreme wealth and extravagant spending" under the three-prong test in *Jackson-Randolph*. 282 F.3d at 377.

Omar insists that it was inadmissible here (1) under Rule 401, because it was irrelevant to the charged conduct; (2) under Rule 404(b), because evidence of cars

bought years before the alleged conspiracy began was not probative of Omar's motive to join the conspiracy; and (3) under Rule 403, because any probative value was substantially outweighed by the prejudice that resulted from painting Omar as a man of lavish spending habits (the cars) and nefarious business habits (the cash).

Omar states that such evidence of wealth or spending is admissible only if "(1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source, and (3) the accumulation of great wealth and extravagant spending relates to the period of the alleged illegal activity." *Jackson-Randolph*, 282 F.3d at 378.  Omar argues that the second prong fails because no evidence showed that he lacked sufficient funds, even without his Tri-County income, to pay off the balances owed for his two cars. He alleges that the third prong fails because the cars were acquired years before Omar joined Tri-County. He concludes that any probative value the evidence of his luxury cars or cash withdrawals was substantially outweighed by the prejudice from the suggestion to the jury that he was unreasonably wealthy and engaged in some nefarious business, as dealing in cash is largely viewed as the province of drug dealers, tax evaders, and other suspicious figures. *See United States v. Srivastava*, 476 F. Supp. 509, 513-14 (D. Md. 2007) (documents reflecting income or wealth could not "be said to be evidence of health care fraud" by a cardiologist because he was engaged in a legitimate and lucrative profession,

unlike a drug dealer). Omar believes this evidence was minimally probative, the harm to him from its introduction was great, and its admission was error and deprived him of the right to a fair trial.

The evidence showed Omar's average hourly pay was $1,245.00, which was "easy money" (per Haq), something that he needed because, as the evidence showed (via Rashid and Special Agent Pemberton) his pulmonary business was not thriving, he was under subpoena from the state, and he did not want to go back to the Emergency Room.  The evidence also showed that Omar continued to make payments on the cars he obtained prior to Tri-County with funds earned at Tri-County, so such evidence was relevant to show that he had a motive for working, ordering tests and injections, and billing in the manner he did at Tri-County.  For these reasons, the Court finds that the evidence is relevant, it is probative of motive, and that any prejudicial value is outweighed by its probative value.

### C.    Cumulative Effect

Omar asserts that a new trial is warranted based on the cumulative effect of all of the errors combined, including but not limited to those discussed above. *See, e.g., United States v. Trujillo*, 376 F. 3d 593, 614 (6th Cir. 2004) ("errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone may cumulatively produce a trial setting that is fundamentally unfair").  Omar contends that the prosecutorial misconduct, including the grouping

of all defendants together, the appeal to class bias, and the suggestion that the jury not review all of the evidence, combined with the impact of the evidentiary errors, warrants a new trial.

For the reasons stated above, the Court finds that Omar has not demonstrated a right to a new trial, whether considered independently or cumulatively.

## V.   Zahoor's Motion for New Trial

Zahoor's motion focuses on the allegedly "inflammatory and egregious" improper remarks by the Government attorneys, as they were made extensively and deliberately throughout trial and during closing arguments, resulting in the violation of his constitutional right to a fair trial and due process, such that he should be granted a new trial. Citing *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) ("Even if we were to find any of the errors, standing alone, to be harmless, their cumulative . . . was clearly prejudicial and combined to deprive [the defendant] of a fair trial."). Zahoor asserts that each improper statement, on its own or cumulatively, was so devastatingly prejudicial to Defendant as to warrant a new trial.

Zahoor alleges the following misconduct by the Government: (a) misstated evidence; (b) asking the jury to disregard the law; (c) using guilty pleas of co-defendants as substantive evidence; (d) conveying arguments to the jury that there was evidence known to the government but not given to the jury that supported a

guilty verdict; (e) asking the jury to ignore their job to examine the evidence separately as to each Defendant; (f) making improper appeals to class prejudice; and (g) commenting on Defendant's guilt which implicated Defendant's fundamental constitutional right to trial. Zahoor contends that each such "foul blow," on its own and cumulatively, caused such devastating prejudice to him as to warrant a new trial.

Zahoor did not object to the alleged improper statements during trial, so he must proceed under a plain error standard and show that the comments of which he complains are not only improper, but also were "exceptionally flagrant." *Bailey*, 547 F. App'x. at 759. Zahoor's arguments regarding items (b), (e), and (f) are essentially the same as some arguments made by Omar and are rejected for the same reasons that Omar's were rejected.

With respect to his complaint that the Government argued that it was evidence of conspiracy that each Defendant offered a different defense, Zahoor offers no authority that holds such an argument is impermissible.  Because each Defendant offered a different reason for how and why he administered services at the Tri-County network the Court finds that the Government had the leeway to **argue** that such discrepancies were probative of Defendants' credibility as witnesses.  Conversely, however, Zahoor (or any Defendant) could have argued that those discrepancies were, and/or the jury could have interpreted those

discrepancies as, evidence that there was no conspiracy. The Court instructed the jury that it should consider whether any witness' testimony contradicted other evidence to evaluate that witness's credibility, as well as instructing the jury more than once that what the attorneys say is not evidence.

Zahoor does not identify any misstated evidence; he and the other Defendants fail to raise any instance where the Government's arguments in closing or rebuttal were not either directly supported by evidence in the record or based on reasonable inferences from the admitted evidence, which is permissible. *Hamilton v. Jackson*, 416 F. App'x at 504.

Zahoor argues that it was improper bolstering or vouching for the Government to argue in rebuttal that "the judge will instruct you we don't have to call every patient. They are saying you could have called a laundry list of patients. You could have called this person, that person. I mean, we could be here, not only for the Super Bowl, but until March Madness calling people." ECF No. 480, Br. at 10 (citing ECF No. 449, Trial Tr. 176:21-25). Defendants failed to object to these statements at trial, and for the following reasons, the Court finds no error now.

During their closing arguments, Defendants elected to challenge the Government's failure to call more patients in light of the charged conspiracy involving so many patients. Betro's counsel said, "I would have expected the Government to bring in a parade of witnesses, a parade of patients. You heard that

there were hundreds of patients in this clinic. They should have paraded them all up here and had them all take the stand." ECF No. 449, at 37. Pappas' counsel attacked the Government's failure to call a patient related to his client. Counsel for Zahoor pointed to the number of patients called by the Government and suggested that fact, standing alone, was enough to support a reasonable doubt. Defendants' comments were voluntary and unprompted.  The Government had not previously represented to the jury that it could have brought in many more witnesses. Defendants' comments also were inconsistent with the Court's instructions that the jury "not make any decision based only on the number of witnesses who testified." ECF No. 449, at 193. The Court finds that Government's general response, although in some instances inappropriate, constituted a reasonable (and arguably necessary) response in this case, particularly when the Government predicated its rebuttal with this statement: "But the Government doesn't have to do that. The Government's burden is to prove its case beyond a reasonable doubt. We can prove that with one witness. We can prove it with 100 witnesses. We only need to bring in enough witnesses to establish that proof for you." *See Bailey*, 547 F. App'x at 761.

The Court next addresses Zahoor's contention that the Government argued to the jury that the guilty pleas of co-defendants Rashid, Mozeb, Haq, and Bolina

constituted substantive evidence of Defendants' guilt.   The statement at issue, made in rebuttal, was:

> Mashiyat Rashid pled guilty to it. Yasser Mozeb pled guilty to being in a conspiracy with these four defendants right here. Abdul Haq, Manish Bolina, they pled guilty to committing crimes doing the exact same things each one of these four defendants did. And so really the only question for you when you go back there is: Were these defendants, who were doing the same thing as everyone else at Tri-County, doing the same thing as Haq and Bolina? Were they involved in a conspiracy or was it just a coincidence?

ECF No. 449, at 146-47.

First, and most important, the argument of the attorneys is not evidence, something the Court repeatedly advised the jury.  So, the jury is presumed to have understood that Government's argument in rebuttal was not evidence of any Defendant's guilt.  Second, Defendants did not object to the comments during the rebuttal (or even after it, *see* ECF No. 486, PageID 7010, fn. 1 (citing ECF No. 448, Trial Tr. 179-85)), which means the Court evaluates the statement for plain error.  Third, the Government may refer to the testimony of a co-conspirator as evidence of his guilt, *Bardley v. Birkett*, 192 F. App'x 468, 474 (6th Cir. 2006) (noting the guilty plea of a co-defendant conspirator "is legitimate as the purpose is to support the reasonableness of the witness' claim to first hand knowledge of admitted participation in the very conduct which is relevant"), and to rebut challenges to a cooperating witness's credibility. *United States v. Benson*, 591 F.3d

491, 499 (6th Cir. 2010). *See also United States v. Carson*, 560 F.3d 566, 575 (6th Cir. 2009).

The Court finds the Government's remarks were not misleading and were related to the credibility of those witnesses, and the Government did not suggest that the guilty pleas established a conspiracy.  During closing arguments, counsel for each Defendant challenged the credibility of at least one of those four co-defendants (Mozeb, Rashid, Haq, and Bolina).  Each Defendant, by testifying, submitted his own credibility for the jury to consider.  After all of the closing arguments, the Court instructed the jury that "[t]he fact that these witnesses have pleaded guilty to a crime is not evidence that the defendants are guilty, and you cannot consider this against the defendants in any way." ECF No. 449, at 211-12. Finally, as noted above, there was substantial evidence of Zahoor's (and each Defendant's) guilt, including Zahoor's admission that he exceeded Medicare's frequency limitation on annual facet joint injections per patient and its rules and regulations concerning urine drug testing, as well as the fact that he noted that injections were ineffective.  The Court finds no plain error on this issue.

Zahoor contests the Government's use of the term "Magic Marcaine" was improper, as were its claims that any benefit the patients at Tri-County experienced was a lucky accident or the result of the opioids being prescribed. The record in this case, including the testimony of many physicians (including Zahoor, Pappas

and Betro), fully supports the suggestion that Marcaine was not designed to, nor did it, afford patients long-term pain relief and that it is only a short-term anesthetic that typically lasted between 2-8 hours. The informed consent form for Tri-County also indicated that injections of Marcaine were diagnostic only, and several beneficiary witnesses testified that they received no pain relief from the injections (and the injections themselves may have caused additional pain). Although the adjective "Magic" may have been a descriptive phrase or colorful perjorative, the statements were not improper and a new trial is not warranted. *Branch*, 591 F.3d at 610.

Finally, Zahoor's argument that the Government commented on Defendant's guilt is misplaced. During rebuttal, the Government stated, "They like to talk about an unrepentant fraudster, that Rashid was called an unrepentant fraudster before he pled guilty. Well, he's pled guilty now, and the only unrepentant fraudsters in this courtroom are the four defendants over here." This statement is not a basis for new trial. Again, no objection to this terminology was made at trial, which means the Court is evaluating the issue under the plain error standard.

This was a trial regarding whether Defendants engaged in fraud, so calling someone a "fraudster" is not improper. *See, e.g., United States v. Branch*, 591 F.3d 602, 610 (8th Cir. 2009). The Government did not use the term to describe Defendants until its rebuttal, after counsel for Betro had used the term "unrepentant

fraudster" to describe Rashid three times during his closing argument and counsel for Omar had used the term when cross-examining Rashid.   It was not unreasonable or error for the Government to do so. *See, e.g., Byrd*, 209 F.3d at 535 (the government's argument was not improper as it was "clearly a suggestion of a reasonable inference to be drawn from defense counsel's presentation of evidence and argument").

For the reasons stated above, the Court finds that Zahoor has not identified any comments that were improper and is not entitled to a new trial.

## V.    Pappas's Motion for New Trial

Pappas argues that the Government, in its closing argument, mischaracterized the testimony of physicians who treated two of Pappas' patients after Pappas, with both of those physicians testifying that Pappas' patients had no facet joint issues.   Pappas contends that characterization was not a reasonable inference from the testimony and was misleading, extensive, and deliberate. Pappas contends that the Government's flagrant arguing of facts not in evidence and mischaracterization of testimony constituted prosecutorial misconduct warranting a new trial.

Pappas specifies the following Government comments:

For example, [the Government] argued that Pappas treated "every patient" the same way "every time."  [The Government] stated that the doctors falsely diagnosed hundreds of patients. [The Government]

> stated falsely that Pappas had testified that the administration of facet joint injections was "nuts." Moreover, [the Government] repeatedly and falsely stated that the post-treating physicians for Pappas' patients testified that they had no back pain. Also, without any support in the record, [the Government] argued that it was probable that the defendants had committed fraud based on a lack of patient complaints. Finally, [the Government] stated that the top practitioner reports (Exhibits 406 and 407) were evidence that Pappas had committed fraud because he was part-time and the other doctors on that list were full-time.

ECF No. 481, PageID 6943-44. Based on what Pappas claims is the misleading nature of these statements, together with the fact that they were deliberate and extensive and the evidence against Pappas was "weak," Pappas asserts that the interests of justice dictate granting him a new trial.

Pappas also asserts that he was denied the constitutional right to present a defense and rebut the Government's allegations when the Court denied his right to call Angela Vann, one of his patients.  The right of a defendant to present witnesses on his own behalf is a fundamental rights of due process and is guaranteed by the Fifth and Sixth Amendments. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (citations omitted).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967).  Pappas cites a number of other cases, including *United States v. Whitman*, 771 F.2d 1348, 1351 (9th Cir. 1993) (after the trial court refused to allow the defendant to introduce evidence to establish that the defendant did not have motive, the Ninth Circuit reversed, concluding that "once the government produced evidence from which the jury could reasonably infer the [] motive, appellant had the right to rebut this evidence.").  He asserts that, although a fact may not be necessary, and may not be an issue at the start of a trial, once the Government raises it as an issue or theory, a defendant has a due process right to rebut as part of the defense. *Id*. (citing *United States v. Crenshaw*, 698 F.2d 1060, 1066 (9th Cir. 1983)).

Pappas asserts that the Government introduced evidence that alternatives were never discussed with any patient and were not available to Pappas' patients because of the "protocol."  Pappas contends that Vann's proposed testimony would have included that: (a) Pappas spent more time with her than the cooperating witnesses (including Jarvis Mitchell) indicated; (b) Pappas gave her and discussed with her treatment that was not part of the "protocol" that "every patient" received; (c) he reduced her medication (Oxy) based on improvements in pain and conducted examinations of her at the visits; and (d) he was giving her knee injections for her knee pain and discussed knee replacement surgery, which she did have done. (ECF 444, PageID 5602-03).

Pappas represents that this testimony would have countered the Government witnesses' testimony and argument and would have cast doubt on the testimony of many cooperating witnesses.  Had Vann been able to testify, Pappas insists, her testimony would have dispelled the notion that there was a conspiracy to give every patient the same treatment.  Pappas claims he was further prejudiced by the exclusion of Vann's testimony when the Government argued that the cooperating witnesses' testimony was not countered and was unassailable.  For these reasons, Pappas argues that the preclusion of Vann's testimony deprived him of due process, such that he should be granted a new trial with a meaningful opportunity to present a defense and rebut the facts and arguments put forth against him.

Pappas notes that none of his patients were called to testify against him at trial, and the testimony against Pappas was from two physicians who treated his patients subsequent to him[2] and cooperating witnesses (Dr. Ali Taqi, Dr. Manish Bolina, Dr. Abdul Haq, Jarvis Mitchell, Yasser Mozeb, Mashiyat Rashid). Generally, Pappas states, those witnesses indicated that every patient was treated the same, but Vann would have "directly refuted the testimony repeatedly elicited by [the Government] that every patient was treated the same.  Her testimony would have established individualized care, especially in light of the complete lack of

---

[2]Two primary care physicians—Dr. Charles Laredo and Dr. Brian Little—testified about their treatment of two Tri-County patients, Brian Johnson and Midge Sheppard. Neither Dr. Laredo nor Dr. Little gave either patient facet joint injections.

patient testimony against Pappas." ECF No. 481, PageID 6944. Pappas also complains that not only were the many statements made by the Government at closing false or not supported by the evidence, they were also unrebuttable because he was not allowed to call Vann. ECF No. 481, PageID 6937-41.

The Court notes that this is not the first time Pappas has raised this issue. Prior to and at trial, Pappas attempted to call Vann as a witness in his defense. The Court excluded Vann. She was not a Medicare beneficiary, so Pappas' treatment of her would not be subject to the same billing and reimbursement. Her testimony would be irrelevant with respect to whether Pappas treated all Medicare patients the same.

The Court notes that Sixth Circuit (and other circuit courts) have consistently held that evidence that a defendant engaged in some conduct that is legal or honest conduct is not relevant in ascertaining whether the defendant engaged in, or had knowledge of, the fraudulent conduct with which he is charged. *See, e.g., United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) ("For the same reason that prior 'bad acts' may not be used to show predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes."). With respect to Vann, the Court determined that Vann's testimony would only have been evidence of good conduct

and was inadmissible under Rule 403.  Pappas's argument in his Motion for New Trial does not persuade the Court that it erred when excluding Vann's testimony.

As discussed above, the evidence against Defendants, including Pappas, was substantial and supported a finding of guilt beyond a reasonable doubt.  Some of that evidence against Pappas was his admission at the time of his arrest that he gave patients twelve injections "regardless of whether they needed them or not." ECF NO. 442, PageID 5340 (Special Agent Pemberton). Pappas also told agents that he agreed to be the owner of Tri-State after Medicare stopped paying Tri-County because "he did not want to go back to the type of work he did before in the ER because the hours were long, the work was hard and the pay was poor." *Id*. at PageID 5341-42.

The Court concludes that Pappas's Motion for New Trial must be denied.

## VI.   Conclusion

Accordingly, for the reasons stated above,

IT IS ORDERED that Defendant Tariq Omar's Motion for New Trial [ECF No. 479] is DENIED.

IT IS FURTHER ORDERED that Defendant Mohammed Zahoor's Motion for New Trial [ECF No. 480] is DENIED.

IT IS FURTHER ORDERED that Defendant Spilios Pappas's Motion for New Trial [ECF No. 481] is DENIED.

IT IS ORDERED.

s/Denise Page Hood
DENISE PAGE HOOD
Dated: May 12, 2022          UNITED STATES DISTRICT JUDGE